AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. ___'23 MJ1471 WVG___ |
| Blue Wiko 16G | ) | |
| Seizure No. 2023250100027401 - 0001 | ) | |
| ("Target Device 3") | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-3, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 841, 843, 846 | Distribution of Controlled Substances, Unlawful Use of Communication Facility, Conspiracy |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Steven R. Merklein, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date: ___April 25, 2023___

*William V. Gallo*
*Judge's signature*

City and state: San Diego, California

Hon. William V. Gallo, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A-3

### PROPERTY TO BE SEARCHED

The following property is to be searched:

> Blue Wiko 16G
> Seizure No. 2023250100027401 - 0001
> **("Target Device 3")**

**Target Device 3** is currently in the possession of Homeland Security Investigations, located at 2055 Sanyo Avenue, Suite 120, San Diego, California 92154.

## ATTACHMENT B-3
ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of March 18, 2023, up to and including April 18, 2023:

    a.    tending to indicate efforts to distribute controlled substances within the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances within the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution of controlled substances within the United States;

    d.    tending to identify travel to or presence at locations involved in the distribution of controlled substances within the United States, such as stash houses, load houses, or delivery points and distribution within the United States;

    e.    tending to identify the user of, or persons with control over or access to, **Target Device 3**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 841, 843, and 846.

**AFFIDAVIT**

I, Special Agent Steven R. Merklein, being duly sworn, hereby state as follows:

**INTRODUCTION**

1.     I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> Black T-Mobile
> Seizure No. 2023250100027401 - 0001
> (**"Target Device 1"**)
>
> Blue Motorola XT2163-1
> Seizure No. 2023250100027401 - 0001
> (**"Target Device 2"**)
>
> Blue Wiko 16G
> Seizure No. 2023250100027401 - 0001
> (**"Target Device 3"**)

as further described in Attachments A-1, A-2, and A-3, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841, 843, 846, as further described in Attachments B-1, B-2, and B-3. The requested warrant relates to the investigation and prosecution of Eugene Andrew FOSTER for distributing fentanyl. The **Target Devices** are currently in the custody of Homeland Security Investigations (HSI) and located at 2055 Sanyo Avenue, Suite 120, San Diego, California 92154.

2.     The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

**BACKGROUND**

3.     I am a special agent employed by the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations. I have been employed as a special agent since November 2018, and I am an investigative or law

1

enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I am currently assigned to DSAC San Ysidro on the Fentanyl Abatement & Suppression Team. Before joining this team, I was assigned to Contraband Smuggling Group Three. Before joining HSI, I was employed as a United States Border Patrol agent. While employed as a Border Patrol Agent I served as a Task Force Officer (TFO) on a Drug Enforcement Administration Narcotics Task Force and worked on both sector and station level intelligence & abatement teams. I also previously served in the United States Army National Guard from 1998–2004, serving as an infantry Non-Commissioned Officer. I received an Associates of Science in Criminal Justice degree from Springfield Technical Community College in 2002.

4.     During my employment as an HSI special agent as well as in my previous positions as a Border Patrol agent and DEA TFO, I've conducted criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling, narcotics smuggling, and organized criminal activity. I have conducted and/or assisted in more than 300 investigations involving controlled substances. I have participated in several controlled purchases of narcotics with the use of confidential informants (CIs) and I have personally conducted hand-to-hand drug transactions while operating in an undercover capacity. I have authored and/or participated in the execution of narcotic-related arrests and search warrants for violations involving controlled substances, including fentanyl, heroin, methamphetamine, cocaine, ecstasy, LSD, marijuana, and pharmaceuticals. Through these investigations, I have gained extensive knowledge from users of narcotics, sellers of narcotics, CIs and veteran narcotics detectives regarding the manner in which narcotics are sold, distributed, transported, stored, concealed and ingested. I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by

2

concealing the controlled substances in vehicles or on persons entering the United States at ports of entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. With respect to the distribution of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, before distributing narcotics, traffickers frequently communicate with the transporters regarding arrangements and preparation for the narcotics distribution. When the distribution is underway, narcotics traffickers frequently communicate with the transporters to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporters to provide further instructions regarding the delivery of the narcotics to a destination within the United States

5.     In addition to my experience, I have received multiple formal trainings related to conducting controlled substance investigations. These courses primarily focused on the identification of controlled substances, case management/development, managing CIs, tactical street operations, undercover operations, surveillance operations, highway interdiction, hidden compartments and various methods of drug trafficking and human smuggling. In addition to these courses, I was previously certified by the California Attorney General to conduct wiretaps as authorized in California Penal Code Section 629.50 et seq.

6.     I have conferred with other agents and law enforcement personnel who are also experienced in narcotics investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit. I have included in parentheses or in brackets my explanations of coded or veiled speech, based on my training and experience, as well as my familiarity with the facts of this investigation. Dates and times are approximate.

3

7.    Based upon my training, experience as a SA, and consultation with law enforcement officers experienced in narcotics trafficking organizations, I am also aware that:

a.    Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are mobile and they have instant access to telephone calls, text, web, email and voice messages; tending to indicate efforts to import and distribute controlled substances within the United States and between the United States and Mexico;

b.    Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

c.    Drug traffickers and their accomplices will use digital devices like cellular telephones, tablets, and laptop computers because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

d.    Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

e.    Drug traffickers will use digital devices like cellular telephones, tablets, and laptop computers to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units as well as the operational status of checkpoints and border crossings;

f.    The use of digital devices like cellular telephones, tablets and laptop computers by traffickers tends to generate evidence that is stored on the digital devices, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

g.    Individuals involved in drug trafficking often utilize digital devices like cellular telephones, tablets, and laptop computers with photograph and video capabilities to take and send photographs and videos of other members of criminal organizations, firearms, drugs, criminal proceeds, and assets purchased with criminal proceeds.

h.    Individuals involved in drug trafficking may utilize laptop computers and cellular telephones to generate or save documents to track proceeds or inventory related to the movement of narcotics or drug proceeds and may visit websites to research or support false background stories in an attempt to create a front of a legitimate operation.

8.    Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM cards) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

a.    tending to indicate efforts to distribute controlled substances within the United States;

b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances within the United States;

c.    tending to identify co-conspirators, criminal associates, or others involved in distribution of controlled substances within the United States;

d.      tending to identify travel to or presence at locations involved in the distribution of controlled substances within the United States, such as stash houses, load houses, or delivery points;

e.      tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

9.      On March 8, 2023, HSI SA Steven R. Merklein responded to a FedEx shipping center located at 1650 47th St., San Diego, CA 92102, and seized a package that contained $19,490 in United States currency, which tested positive for trace amounts of fentanyl. The package was addressed to Eugene FOSTER, with an address on the 900 block of Island Avenue in San Diego, California. SAs were able to positively identify Eugene Andrew FOSTER as the recipient of the package.

10.      On April 10, 2023, at about 3:10 p.m., HSI San Diego special agents (SAs) saw Eugene Andrew FOSTER exit the residence on the 900 block of Island Avenue in San Diego, California (the Island Avenue residence). FOSTER was carrying a white plastic bag with colored markings on it. FOSTER entered his white Mercedes SUV and drove away. SAs surveilled FOSTER's vehicle to a Postal Annex at 1175 Avocado Ave, Suite 101, El Cajon, CA 92020. SAs saw FOSTER exit his vehicle and enter the Postal Annex carrying the same plastic bag he left the Island Avenue residence with. Acting Group Supervisor (AGS) Matthew Rhoa went inside the Postal Annex and saw a shiny tan wrapped package inside the plastic bag. SAs know this type of wrapping to be consistent with the packaging of narcotics. SAs saw FOSTER exit the Postal Annex carrying the bag and a flat cardboard box.

11.      SAs attempted to conduct a consensual encounter with FOSTER as he was exiting the Postal Annex. SA Merklein—who was in plain clothes with a badge around his neck—approached FOSTER as he was opening the door to his vehicle, calling him by his

6

first name, Eugene. FOSTER acknowledged SA Merklein briefly then continued to enter his vehicle and closed the door. As this was happening, another four agents approached FOSTER's vehicle. Two were wearing agency issued, marked body armor, and the other two wearing their badges. An agent placed his vehicle behind FOSTER's vehicle to prevent him from fleeing the scene or hitting agents with his car. SA Merklein yelled to FOSTER to roll down the SUV's window. FOSTER rolled the window down and SA Merklein identified himself and asked FOSTER to exit the vehicle. FOSTER acknowledged SA Merklein but rolled the window back up. SA Merklein went back to his vehicle and put on his marked body armor. SAs approached the vehicle and told FOSTER to open the door. FOSTER opened the door and stepped out of the target vehicle. SAs conducted a pat down for officer safety and walked FOSTER to the rear of the target vehicle. AGS Rhoa advised FOSTER of his *Miranda* rights. FOSTER said he understood his rights and continued to speak to AGS Rhoa. AGS Rhoa asked FOSTER if there was anything illegal in the vehicle. FOSTER initially stammered then told SAs there could be a package of unknown drugs in the target vehicle. FOSTER was placed under arrest at about 3:45 p.m.

12.    SAs conducted a hand search of FOSTER's vehicle and found a package wrapped in tape inside. Also, inside the bag was a roll of tape, dryer sheets, and a bottle of food seasoning. SAs deployed a narcotic trained K9 to sniff FOSTER's vehicle and the dog alerted to the presence of narcotics. AGS Rhoa removed the plastic bag from the vehicle and opened the tape wrapped package. Inside the package was a food container containing a second tape wrapped package, loose dryer sheets, and some of the seasoning found in the bag. AGS Rhoa opened the inner package, which held a vacuumed sealed plastic bag containing a white powdery substance. The substance field-tested positive for the characteristics of both fentanyl and xylazine.

13.    SAs asked FOSTER if there were any more drugs at the Island Avenue residence. FOSTER said that there was maybe some weed but that's it. SAs asked FOSTER if there were any guns at the residence and he said that his son might have a Berretta in a

lock box, but that it was registered to his son. SAs asked FOSTER if he would give consent to SAs to conduct a search of the Island Avenue residence and FOSTER said yes.

14.     At about 5 p.m., SAs conducted a consensual search of the Island Avenue residence—a studio apartment unit. FOSTER's son Diamond was present at the residence and consented to a search of his person and his luggage. SAs searched the residence and found the following items:

- Used cardboard boxes with FedEx shipping labels addressed to and from Foster
- A vacuum food sealer and plastic bags associated with it
- Pound quantities of marijuana in two plastic storage bins
- A small plastic bag containing 14 blue counterfeit M30 pills, which later tested positive for the characteristics of fentanyl
- Two other small plastic bags containing various types of pills, which later tested positive for the characteristics of methamphetamine
- A "Glock 80" style ghost gun with a magazine loaded with 10 rounds of ammo

SAs concluded the search around 6 p.m. and seized the ghost gun and ammo, the fentanyl pills, the methamphetamine pills, and a sample of the narcotics packaging.

15.     During a post-arrest interview, FOSTER waived his *Miranda* rights and agreed to speak with law enforcement officers. FOSTER admitted to shipping various narcotics to multiple locations across the United States. FOSTER said he had been doing it for a couple of months. FOSTER said he would pick up the narcotics from his source, bring the narcotics back to his place, repackage them, and then ship the packages to various addresses provided to him by his source of supply. FOSTER said he would meet the source at different public places then follow the source to an unknown location to receive the drugs. He said he would receive packages at his residence containing cash as payment for the shipments he sent out. FOSTER said he would count the cash, return it to his source of supply, and would be paid $1,000 per shipment. FOSTER said he was shipping stuff out about twice a week and that he used various locations to ship the boxes, but always used FedEx. SA Merklein asked about

the gun SAs found at his residence. FOSTER said it wasn't his, that he let a friend leave it at his place a week or so earlier because they had no place to keep it.

16.     On April 10, 2023, at about 10:30 p.m., FOSTER was booked into the San Diego County Central Jail for violation of California Health and Safety Codes Section 11352(a), transportation of fentanyl, and Section 11351, possession of fentanyl for sales. No state charges were filed, and FOSTER was released on bond a few hours later.

17.     On April 18, 2023, HSI Special Agent Steven R. Merklein swore out a federal arrest warrant for Eugene Andrew FOSTER for violations of 21 U.S.C. § 841(a)(1) – possession of fentanyl, and 26 U.S.C. §§ 5861(d) & 5871 – possession of an unregistered firearm. The arrest warrant was approved and signed by a federal magistrate judge.

18.     At about 12:45 p.m., HSI SAs located FOSTER's white Mercedes SUV in the Bankers Hill Section of San Diego. SAs set up surveillance around FOSTER's vehicle and waited for FOSTER to return to it. At about 4:15 p.m., FOSTER arrived at his vehicle. SA Merklein and TFO Andrew Dion, both wearing their agency marked body armor, exited their vehicle and contacted FOSTER.

19.     The agents executed the arrest warrant and explained to FOSTER that he was going to be transported to a federal holding facility to await his initial appearance in the morning. TFO Dion conducted a safety pat down of FOSTER and placed him in handcuffs. FOSTER had a wallet and three cell phones in his pockets at the time of his arrest. The three cell phones in his pockets are the phones described in Attachments A-1, A-2, and A-3 as **Target Device 1**, **Target Device 2**, and **Target Device 3**.

20.     On April 10, 2023, during FOSTER's initial arrest, SAs seized two cell phones from him. At that time, FOSTER gave consent to search those cell phones. A cursory review of both of those devices showed multiple text messages and photographs relating to narcotics and guns.

21.     Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names,

electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Target Devices** to communicate with others to further the distribution of illicit narcotics into the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks before an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on March 18, 2023, up to and including April 18, 2023. I am asking for the previous stated time period, which is 30 days before FOSTER's arrest.

## METHODOLOGY

22. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards

1  inserted into the device. Current technology provides some solutions for acquiring some of
2  the data stored in some cellular telephone models using forensic hardware and software.
3  Even if some of the stored information on the device may be acquired forensically, not all
4  of the data subject to seizure may be so acquired. For devices that are not subject to forensic
5  data acquisition or that have potentially relevant data stored that is not subject to such
6  acquisition, the examiner must inspect the device manually and record the process and the
7  results using digital photography. This process is time and labor intensive and may take
8  weeks or longer.

9       23.    Following the issuance of this warrant, I will collect the **Target Devices** and
10 subject it to analysis. All forensic analysis of the data contained within the telephone and
11 its memory cards will employ search protocols directed exclusively to the identification
12 and extraction of data within the scope of this warrant.

13      24.    Based on the foregoing, identifying and extracting data subject to seizure
14 pursuant to this warrant may require a range of data analysis techniques, including manual
15 review, and, consequently, may take weeks or months. The personnel conducting the
16 identification and extraction of data will complete the analysis within ninety (90) days of
17 the date the warrant is signed, absent further application to this court.

18              **PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

19      25.    No forensic downloads have been attempted and no other hand searches have
20 been conducted.

21                        **CONCLUSION**

22      26.    Based on the facts and information set forth above, I submit there is probable
23 cause to believe that a search of the **Target Devices** will yield evidence of Defendant's
24 violations of Title 21, United States Code, Sections 841, 843, and 846. Accordingly, I
25 request that the Court issue a warrant authorizing law enforcement to search the item
26 described in Attachments A-1, A-2, and A-3, and seize the items listed in Attachments B-
27 1, B-2, and B-3 using the above-described methodology.

28

                                11

1 I swear the foregoing is true and correct to the best of my knowledge and belief.

2

3

Special Agent Steven R. Merklein

4 Homeland Security Investigations

5

6 Sworn and attested to under oath by telephone, in accordance with Federal Rule of

7 Criminal Procedure 4.1, this 25th day of April 2023.

8

9

10 *William V. Gallo*

The Honorable William V. Gallo

11 United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12